Thank you, Judge Miller. May it please the court. Larisa Harreld on behalf of Hawaii County Police Officer, Derek Kenison, Jr. I'd like to reserve two minutes for rebuttal and I'd like to start out this morning by focusing on the undisputed material facts that make a difference in this appeal. On March 8th, 2018, Charles Edward Larkin, Jr. was in the midst of a mental health crisis. A crisis that was triggered by events occurring approximately two weeks before according to the second amended complaint. And following that triggering event, Larkin's mother, Rosalinda, noticed that Larkin was experiencing increasing paranoia and he wasn't sleeping. He was getting, his mental condition was getting progressively worse. And Larkin's personal behavioral aid assistant also noticed this deterioration in Larkin's mental health condition. By March 6th, Rosalinda's concerns heightened dramatically because she notices that he's afraid that people were following him and that he was too afraid to even take a shower. He called her at 2.30 a.m. that morning asking for help and in distress. So she took him to the doctor that day for his fear, for his paranoia, for his lack of sleep, but his condition didn't improve. The next day, March 7th, Charles Larkin continued to act erratically. In fact, he spent the day blessing various objects like the car and his home. Rosalinda was so concerned that by about 6 p.m. that evening she called a mental health crisis hotline to ask for help in bringing Larkin to the emergency room. A therapist showed up at the house and helped escort a reluctant Charles to the emergency room where he was given a sedative and the family was sent home. The sedative didn't work. Rosalinda called the emergency room at midnight and they told her to give him melatonin. Needless to say, they had a restless and fretful evening. By 7.21 the next morning, March 8th, 2018, Rosalinda sends an email out to Larkin's larger behavioral healthcare team and lets them know about the events that transpired the evening before, that his mania was increasing, that he was up all night blessing the house, coming in and out of her room nonstop, asking her to repeat prayers with Jehovah. And so she concluded by that point that Charles needed help. She was telling the behavioral team that she said that it was not safe for her to leave him home alone and that he was a threat to his own safety. By 7.45 that morning, Larkin's behavioral aide shows up at Rosalinda's house and he notices right off the bat that Charles' paranoia has increased, that he's rebuking him in the name of Jehovah, that he's talking to himself, that he's asking for the house to be blessed, and Tristan and Asuncio notices that something is definitely not right. His supervisor, Malputasi Tai, arrives approximately 15 minutes later at Rosalinda's home. She notices that Larkin is severely agitated, that he's blessing her while at the same time rebuking her in the name of Jehovah. And she too notices that something is definitely wrong. All three of his caregivers recognized that Larkin had to go to the emergency room immediately, as soon as possible, but none of them were able to do so. And may I emphasize that Tristan and Malputasi Tai were trained, had autism training, knew non-threatening techniques to try and deal with autism, but they were unable to get him and convince him to go. Larkin was having none of that. He left his mother's house through the kitchen door unexpectedly and without warning and started walking down the driveway, down Alaloa Road and towards Inaola Drive, which is a major thoroughfare in Hilo. At this point, Rosalinda's concern for her son's safety increases exponentially, for as she testified in the 25 years of his life, because of his mental disability, he had never developed the skill to be able to cross the street alone without help or supervision. He simply did not know how to cross the street. But the officer in question here didn't know all these details, right? I mean, all he heard was there's someone with a mental issue and running out, right? I mean, he didn't know all these facts. That is correct, Judge Lee. Officer Kennison only knew what dispatch told him. He knew that it was a behavioral call, that he was dealing with somebody who was autistic, who had severe anxiety, who had not slept in three weeks, who was on the run or in flight for approximately... Officer Kennison knew when the flight started and knew that he had been in flight the entire time. And so, Officer Kennison knew some facts, but he didn't know the entire background of the prior days of what was happening with Larkin. So by 844- By the way, Counselor, it seems to me, Counselor, if I may suggest, I think the heart of this issue is whether or not there was clearly established a rule that the leg sweep is unconstitutional. Why don't you address your remarks to that issue? Yes, Your Honor. And under the case law, it was Rosalinda's burden to provide precedent establishing that the constitutional violation was clearly established as of March 8th of 2018. And Rosalinda did not meet her burden, nor did the District Court. All of the District Court cited cases dealt with individuals who were either compliant or non-threatening, and that is simply not the situation that we have today. We do have- How was he, I guess he wasn't compliant in the sense that he was continuing to walk away, but there's no suggestion that he was a threat to anyone, is there? Well, he certainly was a threat to himself. And as Officer Kennison testified in his deposition, and in his experience, and they were all on the roadside, at any moment, innocent motorists could have driven by, and Charles, because he was erratic, and we know that mentally disabled individuals in the throes of a crisis can be very erratic and unpredictable, that he could have run out into the street. And that was what Officer Kennison was very worried about, was for innocent motorists. We have to take the facts in the light most favorable to the plaintiff, and the plaintiff has put in evidence, I think from her, from Mr. Matayoshi, and I think the caregiver as well. They all say, I mean, it was a pretty quiet residential neighborhood. I think one of them said that, I mean, in the whole course of this 15, 20 minute sequence of events that I think they saw one car go by. So I mean, I don't wanna totally discount that, but it's not on the spectrum of imminent threats that a police officer might have to confront the seams near the low end, doesn't it? Well, I tend to disagree because we need to, although he crossed a, although Koale Street was a dead end street, Po'okana Street certainly wasn't a dead end street. This is a residential neighborhood with hundreds of homes, and in the 20 to 25 minutes, Larkin wasn't just in a quiet neighborhood. He had actually crossed two major thoroughfares in Hilo, Inaola Drive and Hi-Hi Street. And so the threat that, the lack of threat that the appellee would like to insinuate is simply, Officer Keneson could not guarantee that a car would not drive by at eight o'clock in the morning on a weekday morning. That was just something that Officer Keneson, you know, from the moment Officer Keneson spotted Larkin until he was taken down, 54 seconds had transpired. And there really wasn't so much time for Officer Larkin to now make those, make that analysis about traffic or not. He says that he was focused on Larkin the entire time. And he knew from his experience that they were on the roadside and cars didn't drive by. This was not a closed private street. This was an open public street. Nobody could guarantee that a car wouldn't drive by. So now the district court seems to have viewed either as being sort of two temporally distinct events. One, Officer Keneson grabs Larkin, gives him a bear hug, and Keneson is substantially larger than Larkin. And as the district court saw it, he's sort of grabbed him, essentially has him under control. And then in a distinct event later than that, he does the leg sweep and takes him down. If we view it that way, what possible justification is there for the leg sweep once he's got him grabbed and under control? I think it is erroneous to view the bear hug and the leg sweep in two distinct events. And that is what is at the crux of this appeal here today. Because Rosalinda says that in the split second between the bear hug and leg sweep, Officer Keneson should have known that he had Larkin in his complete control. But let's look at the undisputed facts about that moment. Officer Keneson had no idea how Larkin would behave if he were to ease his grasp and to facilitate handcuffing. Charles had not been taken into custody yet and he could have still posed the threat of flight or further resistance. All of his behavior that morning had indicated that he had no intention of stopping without putting up a fight. And no law required Officer Keneson to take Larkin's involuntary standstill at face value a split second after he stopped running. There is no evidence that Larkin manifested a submission to Officer Keneson's authority that he had made a decision to stop his flight simultaneous to the bear hug or that even Keneson was aware that Larkin stopped his flight. And perhaps even more importantly is Judge Lee's recent opinion in Hyde versus City of Wilcox, which dealt with a post arrest pre arraignment excessive force case, which affirmed that in the Ninth Circuit, the Fourth Amendment's affirmed that for the Fourth Amendment's objective reasonable analysis, the Ninth Circuit's cases routinely call suspects restrained after they have been handcuffed or simply pinned down by officers. And that makes a difference here because Rosa Linda complains about Officer Keneson's acts before the handcuffing before Charles was prone on the sidewalk. She makes no complaints about what happened afterwards. And in fact, there is no force used on Keneson once he's brought to the ground. Indeed in Hyde, Judge Lee cites the Jones versus Las Vegas Metro Police Department case in which a teaser was used to bring down a suspect who was at a traffic stop suspect who was out of the car, who ran away from the offices. And that particular conduct was upheld. Hyde itself cites to Drummond and Tua Tuu Amale Mello versus Green. And in both of those cases, if we could just look at the Drummond case first, Drummond involved a mentally disturbed individual who was acting erratically in a 7-Eleven parking lot. And a caller called in for help because he was afraid that Drummond was gonna get hurt by traffic. The police arrived, an ambulance called. The police were there before the ambulance arrived. And the police made the determination that they needed to take down and bring into custody Drummond for his own safety. So according to the opinion, one officer knocked Drummond down. They don't say how he was knocked to the ground, but he was brought to the ground and then handcuffed. And then Drummond, and that behavior was sanctioned by the court. The court recognized that an officer is allowed to use some means of force, some force to bring, to prevent a mentally disturbed individual from harming himself. And so the knockdown was sanctioned. It's what happened after the handcuffing that was found to be excessive and for which there was no qualified immunity. So if we look at the cases, all of the cases that were cited by the district court, they're based on, they condemn the use of force on a non-resistant, non-threatening individual. But here in the Ninth Circuit, we have precedent. We have Schaefer versus Santa Barbara, County of Santa Barbara, which did involve leg sweep. And there, arguably, the suspect was less resistant and perhaps less of a threat to themselves. And there, although there were issues about the constitutionality of the level of force, the Ninth Circuit determined that it was, that the violation had not been clearly established. But I don't see how Schaefer helps you. And in fact, I think Schaefer is maybe one of the better cases for the plaintiff because there was a jury finding that the, I guess Schaefer was, had resisted the officers. And you're right that we said they were entitled to qualified immunity. But in that decision, which I believe was before the events of this case, we said that the leg sweep there, even on somebody who had resisted arrest, was a violation of the Fourth Amendment. So why doesn't that, why isn't that something that establishes that what happened here was unlawful? Because under these circumstances and the circumstances, the specific circumstances presented here, it is undisputed, and it cannot be disputed that Charles ran from Officer Kennison's approach, resisted and was noncompliant with his commands. And in that scenario, on an emergency behavioral disorder call, Officer Kennison had to do something. He used a low level of force and open hand technique to bring down Larkin in a safe, as safe as possible. No baton was used, no pepper spray, nothing of the sort. What else could Larkin, what else could Officer Kennison have possibly done? The Fourth Amendment does not require officers to use the least intrusive means available. They only must act within a range of reasonable conduct. Nor does the Fourth Amendment.  You've used up all of it, but we'll give you a couple of minutes for rebuttal. And we'll hear from the plaintiff now. And Mr. Remus, you're muted. I'm back up. Good morning, Your Honors. John Remus representing the plaintiffs, Rosalinda Larkin individually, and Rosalinda Larkin as guardian and guardian ad litem of her son, Charles Larkin. I guess I would like to address some of the comments that counsel has already made. The Hyde case is supposed to be determinative of the issues here. I don't see that at all. The Hyde case, and Your Honor, I just actually just got the case yesterday for personal reasons. And I looked at it and did not have the chance to reply formally. But what it addresses is there's a fellow who's in pretrial detention, and he is running through the jail cell, the female jail cells. Three cops try to tackle him, and they use tasers on him. It has nothing to do with facts close to the scenario that we are involved in, in this case. So we have a concession on the part of the state that the county and Officer Keneson and that Tristan was well-trained in mental health. Okay, so what actually happened here is that what did Officer Keneson know? Well, he knew that Charles, through the dispatch, was a skinny, 25-year-old, African-American, autistic male, and that he was suffering an anxiety attack and running away from home. And he was dressed in white and black. Basically, that's the essence of his knowledge. And that's all that these facts show. Given that, what did Officer Keneson do when he encountered Charles? Well, what did he know? He knew that. He also knew that the Officer Keneson had conceded that he was untrained in leg sweeps and that the county of Hawaii, it was against the county of Hawaii's policy to use these leg sweeps. Nonetheless, he doesn't even admit to using, they argue the leg sweep, but Officer Keneson says he didn't use a leg sweep. He used an armbar. And I'll get into that with regards to his state of mind a little bit later. Hawaii County also had a policy that if you were to approach a mentally disturbed individual, you should attempt to use the least amount of force possible in approaching them. Officer Keneson knew when he showed up at Coe La and parked that who was there? He spotted about 54 seconds before he reported Larkin was in custody. He spotted a female, and then he spotted a male consistent with Charles Larkin's description, as well as a car that was in the proximity of Charles. He also knew that there was no report. If I may interrupt, can you address the clearly established prong? I mean, what's the best case that shows this right to be free from a leg sweep in a situation like this is a clearly established right? So I think that's probably the most. Yeah, right. I think the, I think maybe in Diorle, as well as, I'm sorry, I think it was cited in our brief and forgive me for my delay. I think the, even though the holdings may be otherwise, the, when you look in terms of the, the, the Graham factors, we've got Davis v. The City of Los Angeles would probably be the best cases consistent with that. Yeah. Okay. So if I may continue. Anytime. What were the facts of the, in that case Davis v. City of LA? Let me add that here, judge. In your brief is the city of Las Vegas. That doesn't matter any difference, but I just want to be sure we're talking about the same case. Yeah. Yeah. The, actually the, the Davis v. City of Las Vegas, it was also the police officer Miller involved. And this fellow was, was found. Apparently he had, was at a mall and there was a zone that was not permitted to be occupied. So he was considered to be a trespasser. They called him in and then the, the officer wanted to search him. And then, and then it looked at the language of the case to suggest that the gentleman was actually very cooperative and not withstanding the fact that he was handcuffed, the officer then went ahead and rammed his head into a wall and broke his neck. And I think that that's on a parallel track with what we have here. We, and, and, and basically I think the essence of Davis v. The City of Vegas was that there was no precedent required. It was patently obvious that the conduct of the police officer was unreasonably, objectively unreasonable, and therefore no qualified immunity. I'm sorry, Judge Lee. Go ahead. Well, I was gonna say that that sort of brings up the issue that I raised with your colleague on the other side, which is, it seems like a pretty important distinction that Davis involved someone who was handcuffed and thus presumably totally under control. This case does not. And what, what is the authority? I mean, sure he was bear hugged, but what's the authority that says that the officer has to say, well, a fraction of a second ago, I grabbed this guy. I now have him in custody. And therefore, you know, now he's under control and I can't use any, any more. On the ground, we have to, I'm sorry. The underground, we have to look at what, what's the government interest here? I mean, there was no crime committed. What was really happening here? The poor boy was, was asked to be taken, to be secured and taken to a hospital for medication. That's the essence of what happened here. Instead, when he gets bear hugged, there are three witnesses to that event. His mother, Tristan, as well as Mr. Matayoshi. And each of those witnesses say that the bear hug resulted in, he was stopped in his tracks. He was under complete control. And, and that's a direct observation. That's not speculation or conclusory. I mean, they were all there at the same time. And that's what the district court found. There seems to be a distinction between a bear hug and being fully restrained. I mean, I think all of us have seen enough, you know, police cam videos where multiple officers are holding suspect down, but he somehow manages to, you know, extricate himself out of it. So I think there's a difference between being handcuffed or pinned down on the ground versus a hold. Because again, I think we've seen people, you know, show extreme superhuman type strength and extricating themselves out of holds. I agree, Your Honor, but for some very salient facts. Charles was five foot 10, he weighed 114 pounds. Under, you know, the officer Tennyson was six foot one and weighed 395 pounds. I think it was very clear that when Charles Larkin was in a bear hug, he was stopped, period. And there was no escaping from that bear hug. There was no need for this excessive force. There was no need for any further force. And that's where the difference lies. You know, in sports, there are weight categories which are to address safety. And in Olympic boxing, Charles would be deemed a featherweight under 115 pounds. Officer Larkin would be deemed a super heavyweight. Now, that's not a fair match. And I believe that that reality and the observations on the part of both of the three witnesses, one of whom was totally independent, Mr. Matayoshi, the homeowner, clearly observed him, Charles, to be under full control. And then all of a sudden, thrust to the ground for what? I mean, it's a horrible circumstance. That appears to address more of the first prong of qualified immunity or the merits of it. I guess, again, the question then comes down to, was there a clearly established right in a factually analogous situation? And the Supreme Court has been very hard on our court, saying, especially with excessive force, you really have to find a fact that's very, very factually close to it. And I guess that's the one hurdle here for you, is that clearly established prong. Yeah, and I think the district court recited various clearly established analogies. And in those analogies indicated that the force was clearly excessive. And we have an autistic person. There was never any consideration given for this autism. There was no de-escalation of the circumstances. Counselor, if I may, what specific case is your best case on the clearly established prong? Well, I think the case that we just spoke of in terms of Davis, notwithstanding the differential of handcuffs and bear hug, would be a clearly established case. I think the question becomes, it's a question of material fact as to, and if I may, and by the way, I don't have my timer. So perhaps the- Four and a half minutes. Okay, the other thing is, why did, I would submit that why did Officer Kennison know that his conduct was wrong? Well, you know what, after, in his answers to interrogatories, Officer Kennison even denied he injured Charles Larkin. In his answers to interrogatories, he admits that while walking away, he apologized, said, I'm sorry. But I think his state of mind is better reflected in his falsified, fabricated report, which attributed numerous quotes to Rosalinda Larkin, as well as Charles Larkin to justify his conduct. I think when you take each of those things which were addressed in our brief, that Rosalinda Larkin said, oh, don't worry about it, he already had a cut. The officer says, fabricated that Charles had stopped, stooped down and covered his face. He's trying to avoid the fact that it was he who injured Charles Larkin. Charles Larkin. How is any of that relevant at this stage? I mean, the Fourth Amendment analysis is objective and either there was a violation of a clearly established right or there wasn't. And whether, you know, Officer Kennison is being dishonest or not, like, will be relevant, you know, if there were a trial and a jury had to assess his credibility, but how is it relevant to the question before us? Well, I believe it's a factor in the totality of circumstances. And so the, you know, given that, why did he make all of this stuff up? Because I believe he knew that his conduct was wrong. I think when he left that scene, it was an OMG experience for him. And I think that's certainly part of the totality of circumstances. He knew that what he did was unnecessary. He used excessive force, and that's the argument. You know, and all of the allegations are all tailored to the hazardous roadside environment, which there was not. The officer said that the justices and the justification for his stopping him and grabbing him and the leg sweep was that Charles was gonna run into the street and potentially get hit by a car. But the testimony on the plaintiff's side, which the court must look upon favorably, is that Charles was never in the street. He was on the sidewalk. He didn't run in the street as Officer Kennison indicated. He ran onto the sidewalk. He was stopped on the sidewalk and he was thrust and slammed down on the sidewalk. There was never an issue of a dangerous roadside environment. He did nothing whatsoever to deescalate the situation. When he appeared there, who knew best about Charles' condition? His mother. He didn't ask his mother anything. He just yelled as soon as he got out of the car, startled Charles. Charles, being autistic, ran, okay, which is an obvious fight reaction. And then pursued him. And it was less than 10 seconds or thereabouts 10 seconds until this was over. And so he did everything wrong and he knew it is really how we see it. And so he knew that absent precedent, it had to have been obvious to any reasonable police officer that to have done this was unconscionable and it was objectively unreasonable. And that's our argument. Right. There are no further questions. And it looks like there are not. Thank you, Mr. Remus. And we'll hear from Ms. Harreld for rebuttal and let's have two minutes on the clock. You're good, Miller. Mr. Remus started out by talking about Tristan's training in mental health and autism. And Rosalinda has repeatedly asserted that what the fourth amendment required Officer Kenison to do was to first engage in a verbal dialogue with Larkin or to consult with the caregivers on scene as to the best possible strategy to be used in getting Larkin to the emergency room. But the fourth amendment simply does not require that. In fact, the United States Supreme Court in the San Francisco versus Sheehan case, Judge Ginsburg stated that a police officer's knowledge of a person's disability does not foreclose the officer from protecting that disabled individual or the general public. And so it's been clearly established that Officer Kenison was not required to do what Mr. Remus so strenuously argued he was. Let's look at the leg sweep itself. And we are arguing the leg sweep because we're taking the facts most favorable to Rosalinda. But Mr. Remus said that in fact using the leg sweep was against Hawaii County Police Department policy. And that is simply not supported by the record. There is no evidence in the record showing a policy prohibiting or standard operating procedure prohibiting the use of leg sweeps. In fact, the Hawaii Intermediate Court of Appeals in Woodward versus Tabanara had sanctioned the use of a leg sweep against a suspect who had retreated from an officer and through contraband to the side. So there's no violation of the policy or any policy. It is not a trained maneuver, but that does not lead us to the conclusion that it was forbidden or somehow unlawful under Hawaii law. Also Judge Ginsburg, I believe in the Sheehan case also said that a violation of an officer's violation of his or her training or standard operating procedure does not foreclose qualified immunity when it otherwise would have been available to the officer. There is also a Tamberg v. Soltis case from the 10th Circuit, which says basically the same thing that violations of SOPs do not overcome the Fourth Amendment analysis. And then looking to the cases that Mr. Remus cited that under his- Counsel, you're over your time. So if you just want, you can, you have a couple more sentences to wrap up. Deorley doesn't clearly establish it. That is the case that the Supreme Court, I believe, cautioned that it not be read too broadly. It's way too general to apply specifically here. Davis v. Las Vegas, I think that we all can agree that he was handcuffed and it's what happened after the handcuffing. What was the government's interest? We had a very erratic, unpredictable person. We could not guarantee the safety, his safety first and foremost, or that of innocent bystanders. The Supreme Court has made clear that impunity through recklessness will not be condoned under the Fourth Amendment. Mr. Remus talks about the witnesses. Thank you. Thank you. And we thank both sides for their helpful arguments today. And the case just argued is submitted.
judges: O'SCANNLAIN, MILLER, LEE